## St. Paul Fire and Marine Insurance Company of St. Paul, Minnesota v. Kendle.

(Decided February 25, 1915.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Third Division).

1. Appeal and Error—Argument of Counsel—Bill of Exceptions—Trial.—This court cannot consider alleged improper and prejudicial remarks of counsel in argument where the same are not incorporated in the bill of exceptions.

2. Trial—Verdict—When Contrary to Law.—A verdict is contrary to law when it is contrary to the instructions of the trial court, whether right or wrong in their statement of the law.

3. Insurance—Proofs of Loss—Evidence.—Where, under an insurance policy containing a clause requiring that a watchman be kept on board and on duty at all times, the proofs of loss showed that the watchman on duty at the time of the fire was asleep, the proofs of loss justified a refusal to pay the policy, and their introduction in evidence made out a prima facie case for the insurance company.

4. Insurance—Breach of Promissory Warranty—Precautions Against Loss—Watchman.—While the dictionaries define a doze as a light sleep or slumber, yet a man who is dozing so soundly as not to be awakened until the room is full of smoke is asleep for all practical purposes, and nothing is truer than that the man possessed cannot tell the difference.

5. Trial—Verdict—When Contrary to Law.—Where under the evidence an instruction was equivalent to a peremptory to find for

appellant, but notwithstanding, the jury found for appellee, the verdict is contrary to the law of the case, and the fact that the instruction was more favorable to appellant than it should have been does not change this rule.

6. Insurance—Fires—Watchman.—Under an insurance policy requiring that a watchman be kept on board and on duty at all times, the watchman is deemed to have performed his duty when he exercised such care and skill to watch the boat and extinguish. fire as reasonably prudent persons usually exercise in watching such premises during night hours.

7. Insurance—Warranty.—The doctrine of warranties in insurance policies is strictly limited to the precise undertaking of the parties making them.

8. Insurance—Question for Jury.—The question of whether there has been sufficient compliance with a condition in an insurance policy requiring that a watchman be kept on board and on duty at all times is one for the jury to determine.

HELM BRUCE, CHARLES H. STEPHENS and BRUCE & BULLITT for appellant.

JOHN B. BASKIN and HUMPHREY, MIDDLETON & HUMPHREY for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

The appellee owned a ferry boat named "Hiawatha." During the summer season it was also used for excursions. It burned on November 29th, 1911, about midnight, while lying at the bank of the Ohio River in Louisville where it had been tied up for several months.

The appellee held three policies of insurance for $5,000 each. The appellant issued one, and, all the companies denying liability, this case was tried under a stipulation that the result should control liability on the other policies. There was a trial and verdict in favor of appellee, and the insurance company prosecutes this appeal.

The boat was originally owned and the insurance taken out by the Kentucky & Indiana Terminal Railroad Company. It was sold by that company to appellee, and the insurance transferred to him. This occurred two or three months before the fire. The appellee had for a long while served as Captain on the boat, and when he made the purchase he continued one James Niederloh in service as watchman. His father, Charles Niederloh, and one Henry Messenger also acted as watchmen.

The only defense relied upon by appellant was breach of a warranty contained in the policy: ''That at all times at least two competent watchmen shall be employed, one of whom shall be on board and on duty at all times.''

The appellant complains of certain improper and prejudicial remarks made in argument by appellee's attorney, but as these remarks are not incorporated in the bill of exceptions, we cannot consider them on appeal. Practically appellant's whole complaint is that the verdict is contrary to law. By this is meant that the verdict is contrary to the law of the case as expressed in the instructions given to the jury. In the case of Louisville & Interurban Railroad v. Roemele, 157 Ky., 84, it is said:

''To say that a verdict is contrary to law, is to declare that it is contrary to the instructions of the trial court, whether right or wrong in their statement of the law.''

This is the doctrine laid down in the case of Lynch v. Sneed Architectural Iron Works, 132 Ky., 241. As indicated in the latter case, on a question of this kind, the first inquiry is not whether the instruction is correct, but whether the verdict is contrary to the instructions. If so, it should be set aside even though the instruction is erroneous.

The instructions in the case at bar were as follows:

''1. The court instructs the jury that in the policy of insurance sued on in this case, the plaintiff warranted that at all times at least two competent watchmen should be employed on the ferry boat, Hiawatha, and that one of them should be on board and on duty at all times; and if the jury shall believe from the evidence that at the time of the fire there were not two competent watchmen employed on said boat, or, if the jury shall believe from the evidence that at the time of the fire there was no watchmen on duty on said boat, then, in either of said events, they should find for the defendant.

''2. But, if the jury shall believe from the evidence that at the time of the fire, there were two competent watchmen employed on said boat, and that one of them was on board of said boat and on duty at the time of said fire, they should find for the plaintiff, and assess his recovery at the sum of $5,000.00, with interest from the 18th day of January, 1912.

"3. The court further instructs the jury that 'being on board and on duty at all times' means that the watchman shall at all times, while on duty, be in the full possession of his faculties of hearing and seeing; and if the watchman was not in the full possession of his faculties of hearing and seeing at the time the fire began, then he was not on duty as provided for in the policy."

Appellant, under the pleadings, had the burden to show that the watchman was not on duty, or rather that he was remiss in his duty. At the outstart, appellant insisted that appellee had but one watchman employed. But appellee showed that there were three employed on the boat for that purpose, and appellant does not on appeal seriously contend to the contrary. As stated above, the objection is that the watchman was not performing his duty. To sustain the burden it introduced as original evidence the proofs of loss made out by appellee soon after the fire, and forwarded to the company as required by the policy. This proof was made out in the name of James Niederloh and signed by him. At its close, Henry Messenger and Charles Niederloh signed a statement verifying the statement of James Niederloh and adopting it as their own. The three men made affidavits to the statement, which is as follows:

"On the evening of November 29th, 1911, I lit my signal lights and put them in their proper positions, one on the head and one on the stern, at 5 o'clock p. m. About 5:30 p. m. I ate my supper in the forward cabin of the vessel. About 7:30 p. m. I made my usual night round, inspecting the boat, spars, lines, etc., and returned to the forward cabin. I sat around there with my father, Charles Niederloh, and Henry Messenger, both of whom it was understood were permitted to sleep on the boat, for which privilege they assisted me in handling the lines, spars and looking after the boat.

"*About 8:15 my father, Mr. Messenger and myself laid down and I don't know just what time it was that I went to sleep. At 12:10 a. m. I was awakened by the smell of smoke and at once woke my father and Mr. Messenger.* We ran to find the location of fire and discovered it was on the main deck about midship, apparently in the store-room. The smoke was so dense that we could not get to the fire, and there being a very high wind blowing off shore, the boat was burning rapidly. We at once saw there was no possible hope of our put-

ting out the fire and I ran to the corner of 34th and Mississippi Avenue, about one block distant from the boat, and turned in the fire alarm.''

It will be observed that the last round of inspection was apparently made at 7:30 p. m.; at 8:15 the three men lay down, and although the time they went to sleep is not stated, the positive statement is made that they did go to sleep, and, at 12:10 a. m., nearly four hours after they lay down, James Niederloh was awakened by the smell of smoke, and he at once waked his father and Messenger. The fire then had such a start that nothing could be done to save the boat. Taking the instructions as the law of the case, that is, if a watchman to be on duty must have full possession of his faculties of hearing and seeing, then it must be conceded that the proof of loss furnished to the company did not present a state of facts to show liability on the policy, for, admittedly, the men were asleep and the burning boat awoke them. If asleep, they were not in possession of their faculties of hearing and seeing, and, therefore, they were not on duty, that is, were not watching. Manifestly, the proofs of loss justified a refusal to pay the policies and their introduction in evidence made out a *prima facic* case for the insurance company.

Thereupon the plaintiff testified in his own behalf, and, while he had no personal knowledge of the circumstances of the fire, he explained the arrangements made with the three men and their duties so that one of them should be on board and on duty at all times. He also testified that they were experienced steamboat men, and that James Niederloh had been the watchman on this same boat continuously for at least eight years. As master and owner of the boat and holder of the policy it appears, from his testimony, that he had done all that he could, short of watching in person, to comply with the terms of the policy. At least he did all that a man of ordinary care and prudence could or would be expected to do under the circumstances of the case.

He then introduced the three watchmen. The testimony of Charles Niederloh and Messenger was not different from their statement in the proof of loss except that they thought the fire was discovered shortly before twelve o'clock. They admitted they went to sleep about the time they lay down, and so continued until they were wakened by James Niederloh when the cabin was full

of smoke and the fire was under big headway. It is true, in speaking of being asleep, they frequently refer to it as dozing, but when measured by the instructions it is a distinction too delicate to note.

We note the material part of James Niederloh's testimony:

'Q. Where were you when the fire broke out? A. I was sitting on a cot in the forward cabin. Q. About what time did the fire occur? A. Well, I would judge about twenty minutes to twelve o'clock. Q. And you had made your last round about that hour? A. At some place around 11 o'clock. Q. Were you undressed? A. No, sir. Q. Did you have all your clothes on? A. Everything. Q. Did you regularly go to bed? A. No, sir, I never went to bed as long as I was on duty; when I went to bed Messenger would be on watch. Q. While you were sitting there on the cot, did you go to sleep? A. Well, I could not say it was asleep, it—I was just dozing off. Q. What was the first you knew of the fire, what called your attention to it? A. I was sitting on the bed, the cabin got full of smoke; I woke up, I thought it was the stove; I raised up, looked at the stove, and I looked out the window—I could see an electric light out the window, I couldn't see it that night —I could see the smoke coming up past the window.''

This testimony is materially different from the proof of loss, although not inconsistent. The affidavit said the usual round of inspection was made about 7:30, but he did not say that was the last round. It appears that he made a round of inspection about every hour, and on this night the last round was about 11 o'clock, and he says the fire occurred about 11:40 instead of 12:10, that is, 20 minutes before the usual time for the next inspection. He also testifies that the customary way of performing the duty of watching a boat was to make a round of inspection at least every hour during the night, and, of course, to be awake all the time. With his clothes on he was sitting there on the bed, and while he would not say he was asleep and maintained that he was just dozing off, he admits in the same connection that "the cabin got full of smoke; I woke up." A man who "wakes up" or is dozing so soundly as not to be awakened until the room gets full of smoke, is asleep for all practical purposes. While the dictionaries define a doze as a slumber or light sleep, nothing is truer than

the fact that the man possessed cannot tell the difference, and what he tells is unreliable. He is unconscious, and, therefore, not in possession of his faculties either of hearing or seeing. While dozing he might be more easily aroused, but he is none the less unconscious. If to be on duty means that he must be in a position and in condition to see and hear, then the evidence certainly shows that none of the men supposed to be watching were actually on duty.

Under this evidence, the instruction was equivalent to a peremptory to find for appellant. But notwithstanding the instruction, the jury found for appellee. Clearly then the verdict is contrary to the law of the case, and ordinarily that is sufficient reason for reversal. But if the instruction is more favorable to the appellant than it was entitled to under the evidence, and we believe such to be the case here, ought the judgment to be reversed? As above indicated, the instruction amounted to a peremptory, yet the jury disregarded it. It is the peculiar function of the court to determine the law of the case, and in the application of that law, the jury will determine the facts, but here we have a case where the jury not only determined the facts, but the law also. If the jury had disregarded a peremptory instruction framed in the usual form, can there be any doubt as to the duty of the court, and what would have been his ruling under the circumstances? Can it be said that this jury would have given appellant a fair trial under instructions less favorable to it, when they refused to find for it under an instruction which was equivalent to a peremptory? It follows necessarily that the verdict should be set aside as contrary to law, and because the jury was swayed by passion and prejudice.

There is much to be said on the other side of this question, and taking a one-sided view of it, it would seem that if the appellant cannot win under the instruction given, it cannot win at all, and that it ought not to be heard to complain at an instruction too favorable to it. That argument would be sound if the appellant's complaint was directed at the instruction, but that is not the case. It is satisfied with the instruction, but insists that the jury was prejudiced against it. It is unnecessary to speculate what would be the decision of this court if this was an open question.

The case of Lynch v. Architectural Iron Works, 132 Ky., 241, 116 S. W., 693, is decisive. It contains an ex-

haustive review of all the authorities, and after a further consideration of the matter we are not disposed to depart from the ruling announced in that case. The appellant Lynch complained that the jury in arriving at their verdict wholly disregarded an instruction and returned their verdict against him in spite of that instruction. His counsel urged that, "Without entering into a consideration as to whether or not this instruction properly presented the law, as warranted by the facts proven, nevertheless, it was the law of the case, and in disregarding it and returning a verdict in favor of plaintiff (appellee) as they did, the jury found contrary to the law, and that the judgment predicated upon their verdict should be reversed and a new trial awarded.

This court so ruled in the following language:

"After a full consideration we adhere to the rule inferentially declared in Smith v. Morrison, positively announced in Armstrong v. Keith, and subsequently followed by the superior court in the several opinions to which we have referred, and by this court in the later case of Curran v. Stein, that it is the duty of the trial jury to 'conform to the instructions of the court upon matters of law.' In other words, that it is the exclusive province of the court to determine questions of law, and that of the jury only to apply the facts proven to the law as given by the court; and, when it is stated that the verdict is contrary to 'law,' reference is had to the law as given by the court, and not as it might or should have been given."

Since, in our opinion, the judgment must be reversed, and a new trial had, for the reasons above stated, it becomes necessary now to consider the law applicable to the facts proven, so that a proper instruction may be given on the next trial.

Appellee argues that when the owner employed two competent watchmen and kept one of them on board at all times, and the watchman on board made a round of inspection every hour during the night, according to custom followed by steamboat watchmen during the night hours, then the owner has complied with the warranty in the policy, and the watchman was on duty in the meaning of the warranty. In other words, when the warranty is silent as to what constitutes the duty in this regard, then the prevailing custom should control.

But appellant contends that the parties did not agree. simply that reasonable care should be taken of the boat or that a watch should be kept on the boat in accordance with the usual custom in such cases, for it says that the obligation upon the owner was not only to employ two watchmen, but to keep one on board at all times, and that he should be actually on watch at all times. The reason for this, as argued by appellant, is that by having two watchmen employed they could take alternate turns, and one keep awake and watch while the other slept, and the one awake, that is, actually on duty would thus be in a position to detect the first sign of fire either by the smell of it or by the sight of the smoke, and thus be enabled promptly to extinguish it, whereas, if he is asleep, the fire may get such headway as to be beyond control. This idea stated in fewer words, could be thus expressed: The company insures the owner against loss by fire on condition that the owner prevents the fire. Manifestly this was not the purpose of the parties. For if the owner may prevent the fire, he needs no insurance. The owner desired protection against the danger of fire, and the purpose of the policy was to afford that protection. It was competent for the company to exact and the owner to promise that the risk be reduced by the employment of two competent watchmen, one of whom shall be on board and on duty at all times. It does not say just what place on the boat he shall be or how many rounds of inspection he shall make. No stations were provided for the watchmen to call and he was not required to register the hour, so that positive proof might be had that he was awake. It was no doubt contemplated that the watchman should keep awake, for one asleep cannot very well watch, that is, see anything. We do not believe the owner voided the policy by not himself staying awake and standing guard over the watchmen. Fairly construed, the watchman must be deemed as having performed his duty when he exercises such care and skill to watch the boat and prevent and extinguish fire as reasonably prudent persons usually exercise in watching such premises during night hours. Evidently that was all that the warranty required of the owner, that is, that he would employ such men as watchmen. The doctrine of warranties in insurance policies is strictly limited to the precise undertaking of the parties making it.

Steamboat watchmen have other duties than detecting fires. They keep off trespassers, handle spars and lines, and prevent the boat from getting grounded or swamped by the varying stages of the river. The warranty did not stipulate that the watchman should not be burdened with these other duties, nor was he required to be constantly on the lookout for fire, and looking for fires only.

The appellant relies upon the case of Manheim Ins. Co. v. Tyner, 142 Ky., 22, 133 S. W., 1000. This was a suit upon a policy covering a steamboat with a watchman clause the same as in the case at bar. At the time of the fire there was no watchman on board. He had gone to his supper some four or five squares away. Upon leaving he spoke to a watchman on another boat nearby, to keep a lookout on his vessel. To quote from the opinion:

"Thus we see that both requirements of the warranty were broken; there were not two watchmen employed; nor was one watchman kept on duty at all times. The purpose of requiring that two watchmen should be employed was that when one was called away to his meals or was asleep, the other might be on duty. It was agreed that one should be on duty."

A watchman asleep on duty, that is, during his turn, is not doing his duty, but if one be off the boat while he is employed to be there, he is not even on duty. The owner agreed to keep a watchman on duty, that is, on the boat, and the contract says that he shall employ competent ones, that is, men who the owner believes will do their duty. We do not understand the Tyner case to hold that the owner has not complied with his warranty when he employs two competent watchmen, and when he keeps one of them on board and on duty, that is, taking his turn as watchman and staying on the boat.

The case of London & Lancashire Ins. Co. v. Gerteisen, 106 Ky., 815, arose from a policy on a distillery, containing a clause that the owner would keep a night watchman on duty during all hours of the night. There was a watchman and he had gone around and seen about everything less than an hour before the fire, but at the time of the fire he was sitting down reading a newspaper. It was contended that the warranty was broken by the inattention of the watchman, that is, that it was his duty to keep constantly watching at all hours of the night.

In effect, the court held that the owner had performed his duty in that case and was entitled to recover, because he had used ordinary care in keeping a watchman on duty at all hours of the night. Section 186 of Wood on Insurance was quoted with approval:

"When a policy requires a watchman to be kept on the premises, the insured is not required to keep one there constantly; but only at such times and during such periods as men of ordinary care and skill in such business employ one, and in this respect, the usage of similar establishments is admissible."

While, in the case at bar, the owner was obligated to keep a watchman there constantly, there is nothing in the warranty to indicate that the duties of the watchmen should be any different from the usage of similar establishments by men of ordinary care and skill.

The case of Whealton Packing Co. v. Aetna Ins. Co., 185 Federal, 108, is relied upon by appellant. The owner warranted to keep a competent watchman on board at all times. While the boat was lying at the wharf, the watchman went ashore to secure a change of clothing and while gone the boat caught fire and was consumed. The court held that this was a breach of the warranty, and avoided the policy. But, as we have already indicated, the case at bar is different. The watchman was on board and on duty, that is, taking his turn to watch. Appellant contends that because he was not awake at all hours, he was not on duty; but that was a question for the jury, in view of the fact that the policy does not say just what the watchman shall do in the performance of his duty. Cooley's Briefs on the Law of Insurance, Volume 2, page 1811, gives the following statement of the law which we believe is applicable to this case:

"In other words, while it is the duty of the insured to employ an ordinarily competent and reliable watchman, he does not warrant that such watchman will never take his eyes off the premises, or even that he will always be awake. It has, therefore, been held that the fact that the watchman was asleep when the fire broke out does not show a breach of the condition. Andes Ins. Co. v. Shipman, 77 Ill., 189; Phoenix Assur. Co. of London, England v. Coffman, 10 Tex. Civ. App., 631, 32 S. W., 810; Burlington Fire Ins. Co. v. Coffman, 13 Tex. Civ. App., 439, 35 S. W., 406.

"The principles laid down in the cases discussed in the preceding subdivisions are to a great extent based on the theory that the duty of a watchman is performed if he exercises the same degree of care and diligence that an ordinarily prudent person would exercise."

The question whether there has been sufficient compliance with the condition is one for the jury to determine. Parker v. Bridgeport Ins. Co., 10 Gray (Mass.), 302; Percival v. Maine M. M. Ins. Co., 33 Maine, 242.

On another trial the court will give the following instruction in lieu of instruction No. 3:

"The court instructs the jury that it was the duty of the plaintiff to exercise ordinary care to employ two competent watchmen, one of whom should be kept on board the boat at all times, and it was the duty of the one on board the boat to exercise such care and skill to watch the boat as reasonably prudent and careful men usually exercise in watching similar premises during night hours."

The judgment is reversed for proceedings consistent with this opinion.